No. 25 July 11, 2024 561

IN THE SUPREME COURT OF THE
STATE OF OREGON

STATE OF OREGON,
*Respondent on Review,*

*v.*

DEMETRIO MEDINA SOTO,
aka Demetrio Soto,
*Petitioner on Review.*

(CC 18CR75404; 18CR47005)
(CA A174899 (Control); A174900) (SC S069907)

On review from the Court of Appeals.*

Argued and submitted September 12, 2023.

Rond Chananudech, Deputy Public Defender, Office of Public Defense Services, Salem, argued the cause and filed the briefs for petitioner on review. Also on the briefs was Ernest G. Lannet, Chief Defender, Criminal Appellate Section.

Kirsten M. Naito, Assistant Attorney General, Salem, argued the cause and filed the brief for respondent on review. Also on the brief were Ellen F. Rosenblum, Attorney General, and Benjamin Gutman, Solicitor General.

Before Flynn, Chief Justice, and Duncan, Garrett, DeHoog, Bushong, and Masih, Justices, and Nakamoto, Senior Judge, Justice pro tempore.**

GARRETT, J.

The decision of the Court of Appeals and the judgment of the circuit court are affirmed.

_____

* Appeal from Marion County Circuit Court, Thomas M. Hart, Judge. 322 Or App 449 (2022) (nonprecedential memorandum opinion).

** James, J., did not participate in the consideration or decision of this case.

**GARRETT, J.**

Defendant was convicted of multiple crimes following an incident in which he entered the victim's apartment in the middle of the night, forcibly moved her from the entryway to a more secluded area of the apartment, and proceeded to strangle, sodomize, and assault her behind closed doors. On review, we consider two issues. First, defendant was convicted of first-degree kidnapping, ORS 163.235, on the theory that he had moved the victim "from one place to another" for purposes of that offense when he carried her from the entryway to a bedroom and then to the attached bathroom, where the other crimes occurred. Defendant contends that the evidence of his moving the victim within her own apartment is legally insufficient to meet the "from one place to another" element (also known as the "asportation" element) of kidnapping. The trial court and the Court of Appeals both rejected that argument. We allowed defendant's petition for review to consider that question, and we now affirm.

The second issue on review is whether the evidence allowed the trial court to impose consecutive prison sentences for defendant's first-degree kidnapping and first-degree sodomy convictions. A trial court has discretion to impose consecutive terms of imprisonment for separate convictions arising out of a "continuous and uninterrupted course of conduct" if the court makes certain findings. ORS 137.123(5). One such finding is that the offense for which the consecutive sentence is imposed "was not merely an incidental violation of a separate statutory provision in the course of the commission of a more serious crime but rather was an indication of defendant's willingness to commit more than one criminal offense." ORS 137.123(5)(a). On review, defendant argues that the evidence precludes such a finding because he had "one central criminal objective" in kidnapping and sodomizing the victim. We reject that argument as well.

## I.  BACKGROUND

This case reaches us in the posture of defendant's appeal from the trial court's denial of his motion for judgment of acquittal. As such, we state the facts underlying defendant's

convictions in the light most favorable to the state. *State v. Sierra*, 349 Or 506, 508, 254 P3d 149 (2010), *adh'd to as modified on recons*, 349 Or 604, 247 P3d 759 (2011).

## A. *Historical Facts*

The incident giving rise to defendant's convictions occurred in the victim's three-bedroom apartment, where she lived with her children. Defendant is the father of the victim's youngest child. The victim was awake in the early hours of the morning waiting for a friend to come over. She heard a knock and opened the door slightly in response, but instead of her friend, defendant was at the door. Defendant pushed the door open, grabbed the victim, and carried her approximately 25 feet into her bedroom.

Defendant threw the victim on the bed and began insulting her and calling her names. He turned up the volume on the TV and closed the window. He closed the children's bedroom door, then the victim's bedroom door, then grabbed her by the hair, dragged her into the attached bathroom, and closed that door. Inside the bathroom, defendant choked the victim, punched her in the head several times, and called her names. He recorded the victim on his phone and forced her to smoke methamphetamine, stating that he was going to prove that she was an unfit mother. Defendant then forced the victim to perform oral sex on him.

## B. *Procedural History*

The state charged defendant with first-degree kidnapping, ORS 163.235; first-degree sodomy, ORS 163.405; first-degree burglary, ORS 164.225; strangulation constituting domestic violence, ORS 163.187; fourth-degree assault constituting domestic violence, ORS 163.160; and menacing constituting domestic violence, ORS 163.190. At the close of the state's evidence, defendant moved for judgment of acquittal on the first-degree kidnapping charge, arguing that "[t]he kidnapping, the moving her in the apartment, is not what this is about. It's not a kidnapping. It's a break-in, assault, burglary, whatever you want to call it, not an actual kidnapping." In response, the state argued, among other things, that defendant's forced movement of the victim was not merely incidental to his other crimes, and that the bathroom where those other

crimes occurred was a qualitatively different place from the entryway. The trial court denied defendant's motion, agreeing with the state "that the asportation was not incidental."

At the close of the bench trial, the trial court found defendant guilty of all charges. As to kidnapping, the court specifically found that defendant's actions in picking the victim up and carrying her to her bedroom and bathroom constituted asportation. The court imposed a 130-month sentence for the first-degree kidnapping charge and a 100-month sentence for the first-degree sodomy charge, with 14 months of the latter to run consecutively to the former. The court explained that defendant's "decision to commit the sodomy, while [he was] exercising power and control in the form of domestic violence with regard to the kidnap and the burglary, justifies a consecutive sentence."

C.  *Appeal*

On appeal, defendant argued, as relevant on review, that the state had failed to prove the asportation element of kidnapping. Defendant argued that the victim's ending place in the bathroom of her apartment was not "qualitatively different" from her starting place at the front door of her apartment, and that defendant's movement of the victim within her own apartment had been merely incidental to his other crimes.

Defendant also argued that the trial court had not made the requisite findings to impose consecutive sentences for the kidnapping and sodomy convictions. Specifically, he asserted that the commission of the sodomy had had the same purpose as the kidnapping—to control and demean the victim—and that the record, therefore, did not support a finding that he was willing to commit multiple offenses.

The state reprised its arguments to the trial court regarding the asportation element.[1] As to the consecutive

_____

[1] Before the Court of Appeals, the state argued that the asportation issue was unpreserved because defendant's motion for judgment of acquittal did not address asportation as a distinct element. However, the record reflects that the state and the trial court both understood asportation to be at issue in defendant's motion, as the state made arguments specific to asportation and the trial court expressly addressed that element in its ruling. Further, the state has not raised the preservation issue in this court. We therefore conclude that the

sentence, the state argued that kidnapping and sexual assault are qualitatively distinct, and that the sodomy had not been merely incidental to the kidnapping.

The Court of Appeals affirmed. Regarding the asportation element, the court concluded that a reasonable factfinder could have found that defendant, before assaulting and sodomizing the victim, increased her isolation by moving her from the front door of her apartment—an area where others might have seen her—to the bathroom—a more isolated part of the apartment that could only be accessed through the primary bedroom. The court further concluded, without explanation, that the trial court's imposition of consecutive sentences under ORS 137.123(5)(a) was proper.

Defendant petitioned for review, which we allowed.

## II.  ANALYSIS

In reviewing a trial court's denial of a motion for judgment of acquittal, this court must determine, viewing the evidence in the light most favorable to the state, whether a rational factfinder could have found the elements of the crime beyond a reasonable doubt. *State v. Reed*, 339 Or 239, 243, 118 P3d 791 (2005).

### A.  *Kidnapping Statute*

The essential elements of kidnapping are set out in ORS 163.225, which defines the second-degree crime. A different statute, ORS 163.235, elevates second-degree kidnapping to the first-degree crime if a person violates ORS 163.225 with a certain "purpose." In this case, defendant disputes whether an essential element of the second-degree crime was satisfied. He does not dispute that, if the state's proof of the second-degree crime was legally sufficient, then the proof of the first-degree crime also was sufficient. Accordingly, the relevant statute for present purposes is ORS 163.225. That statute provides:

---

policies underlying the preservation rule have been sufficiently served. *See State v. Parkins*, 346 Or 333, 340, 211 P3d 262 (2009) (noting "the important policies behind the preservation rule—*e.g.*, procedural fairness to the parties and the trial court, judicial economy, and full development of the record").

"(1)   A person commits the crime of kidnapping in the second degree if, with intent to interfere substantially with another's personal liberty, and without consent or legal authority, the person:

"(a)   Takes the person from one place to another; or

"(b)   Secretly confines the person in a place where the person is not likely to be found."

The statute thus provides that a person may commit kidnapping in either of two ways: by taking a victim "from one place to another," or by "secretly confin[ing]" the victim in a place where the victim is unlikely to be found. We have described the first of those as the "asportation" theory of kidnapping, *Sierra*, 349 Or at 511, which is the theory under which defendant was charged.

Defendant contends that the evidence, viewed in the light most favorable to the state, is insufficient to show that he moved the victim "from one place to another" within the meaning of the statute. That argument presents a question of statutory interpretation. Applying our methodology set out in *State v. Gaines*, 346 Or 160, 171-72, 206 P3d 1042 (2009), we determine the intent of the legislature by considering the text in context, along with any legislative history that we consider helpful.

This court has construed the phrase "from one place to another" in several cases that provide the starting point for our analysis. Over time, our case law has identified two distinct requirements in the asportation element. First, "a defendant can be said to have moved the victim from 'one place' to 'another' only when the defendant changes the position of the victim such that, as a matter of situation and context, the victim's ending place is *qualitatively different* from the victim's starting place." *Sierra*, 349 Or at 513 (emphasis added). Second, even if that requirement is met, the movement can satisfy the asportation element only if it was "not incidental" to the commission of another crime. *Id.* at 513-14.

The "not incidental" requirement has its origins in *State v. Garcia*, 288 Or 413, 605 P2d 671 (1980). The defendant in *Garcia* had grabbed the victim while she was walking alone, put his hand over her mouth and held a knife

to her throat, and took her behind a house more than two blocks away, where he forcibly raped and sodomized her. *Id.* at 415. At trial, the defendant did not move for judgment of acquittal, and thus, we did not address whether the evidence was sufficient to prove the elements of the defendant's kidnapping conviction. *Id.* at 422. Instead, the defendant argued that a separate conviction for kidnapping, in addition to his convictions for first-degree rape and first-degree sodomy, was contrary to the legislative intent of the kidnapping statutes. *Id.* at 415. Citing the legislative history of those statutes, we explained that the legislature had "intended that there be no conviction of the defendant for the separate crime of kidnapping where the detention or asportation of the victim is merely incidental to the accomplishment of another crime, particularly that of robbery or rape." *Id.* at 420.

Decades later, in *State v. Murray*, 340 Or 599, 136 P3d 10 (2006), this court first construed the phrase "from one place to another." The victim in *Murray* had been sitting in the driver's seat of her car when the defendant opened the car door and attempted to push his way inside. *Id.* at 601. The victim physically resisted, but the defendant finally pushed her over to the passenger seat. *Id.* at 601-02. The victim exited through the passenger door, and the defendant drove away. *Id.* at 602. At issue was whether the evidence supported a finding that the defendant had moved the victim "from one place to another" within the vehicle. *Id.* at 603.

This court observed that "the concept of 'taking' a person 'from one place to another' is, at bottom, an exercise in metaphysics." *Id.* We noted the lack of a definition for "place" in the criminal code, and that resorting to the dictionary definition was unhelpful. *Id.* at 603-04 (citing *Webster's Third New Int'l Dictionary* 1727 (unabridged ed 2002), which defined "place" as "an indefinite region or expanse"). We therefore turned to the legislative history of the kidnapping statutes, relying extensively on the earlier examination of that history in *Garcia*. *Id.* at 604-06.

Based on *Garcia*, we determined that the "'place' in which something or someone may be found and from

which that something or someone may be taken is situational and contextual. It is, among other things, a function of the object to be moved, as well as a function of the area in which the movement occurs." *Murray*, 340 Or at 606. With that in mind, we noted that there was no evidence that the defendant in *Murray* had tried to keep the victim in the car; instead, he had driven the car away. *Id.* That indicated that, even assuming that there had been some sort of asportation when the victim shifted positions within the car, it had been merely "incidental" to the defendant's theft of the car. *Id.*

Several years later, this court expanded on what it means to move a victim "from one place to another." In *State v. Walch*, 346 Or 463, 465, 213 P3d 1201 (2009), the court considered whether moving the victim less than 15 feet, from the driveway of a house into the trunk of a car, satisfied the asportation element.

We reiterated that the legislature had not intended for conduct that was "incidental" to other crimes to be separately punishable as kidnapping. *Id.* at 471. But aside from that legislative concern, we observed, the legislature's intent behind the defendant's required "movement" of the victim was less clear. *Id.* at 471-73. We explained that the drafters had considered but declined to fully adopt either the Model Penal Code or the New York versions of the kidnapping statute, which contained distance and time requirements. *Id.* at 472. We further determined that the legislature had not intended to incorporate a "substantial distance" requirement into the asportation element of the statute. *Id.* at 473. We observed, however, that the wording of the asportation element narrows the definition of kidnapping in a different way, by requiring movement "'from one place to another'—not, for instance, that the defendant simply 'move' the victim or move the victim 'any distance.'" *Id.*

All of that said, we recognized that the distance moved is an important consideration in determining whether the victim was moved "from one place to another," but not the only consideration. *Id.* at 475. Because the drafters' primary concern in enacting the kidnapping statute was to protect the victim's personal liberty or "freedom of movement," we determined that another important factor in

the asportation analysis is "whether the movement served to limit the victim's freedom of movement and increase the victim's isolation." *Id.* Applying those principles to the facts in *Walch*, we held that the jury could have found that the defendant took the victim "from one place to another" because the defendant moved the victim approximately 15 feet from an open driveway—a place where she could have run away or been seen by others—to the trunk of a car—a more isolated place that also made her more susceptible to being moved again. *Id.* at 476.

Finally, in our most recent case involving the asportation element, we synthesized our holdings in *Murray* and *Walch* and, in the process, further explicated the meaning of "from one place to another." In *Sierra*, the defendant had confronted a convenience-store employee, Derrick, outside the store, pointed a loaded crossbow at him, and directed him inside the store through a rear entrance. 349 Or at 509. Once inside, the defendant forced Derrick to kneel behind a counter. *Id.* Hearing the commotion inside, two other individuals, Jeter and Mintun, entered near the front of the store. *Id.* The defendant told them to leave; when they refused, he pointed the crossbow at them and ordered them to approach the counter in the back of the store and kneel next to Derrick. *Id.* at 510. For that conduct, the defendant was convicted of crimes including first-degree kidnapping of Derrick and second-degree kidnapping of Jeter and Mintun. *Id.* On review, the question was whether the forced movements of Jeter and Mintun within the convenience store satisfied the asportation element of the kidnapping statute. *Id.* at 511-12.

We held that the evidence of that movement was legally insufficient to prove asportation. *Id.* at 518. Relying on the earlier discussions in *Murray* and *Walch*, we emphasized that, to constitute asportation, the movement must "change[] the position of the victim such that, as a matter of situation and context, the victim's ending place is qualitatively different from the victim's starting place." *Id.* at 513. The court explained that, in light of those principles, the divergent outcomes in *Murray* and *Walch* made sense: *Murray* involved movement that was incidental to the defendant's

substantive crime of stealing the car, while *Walch* involved "non-incidental movement of the victim between two qualitatively different places." *Id.* at 514-15.

From there, the court went on to dispel a few "misconceptions" regarding the meaning of "from one place to another." *Id.* at 516. First, we cautioned that "minimal movement that effectuates little change in the victim's position—such as, for example, movement requiring one to step to the side, or move from a standing position to a sitting or lying position"—will be unlikely to qualify. *Id.* Next, we said that "the degree of force or threat used by a defendant to effectuate the victim's movement" is typically irrelevant to the inquiry. *Id.* Finally, we explained that "the degree by which the movement in question increases defendant's control over the victim, or isolates the victim from the view of others, is relevant" to the asportation inquiry "only to the extent that those considerations tend to demonstrate the qualitative difference between where the victim started ('from one place') and where the victim was as a result of the defendant's conduct ('another [place]')." *Id.*

With those principles in mind, the court determined that the defendant had not moved Jeter and Mintun "from one place to another." *Id.* at 517. Key to that conclusion was that Jeter's and Mintun's beginning location (inside the store, near the front door) and their ending location (inside the same room, behind a counter near the rear) were not qualitatively different. *Id.* Instead, the court noted, "Jeter and Mintun ended up in the same room of the same building that they had entered." *Id.* The court also concluded that the defendant's movement of Jeter and Mintun was "incidental to—that is, inherent in, or a chance or minor consequence of—[the] defendant's independent crimes of unlawful use of a weapon or menacing against those victims." *Id.* at 517-18. The court explained that, in light of Jeter's and Mintun's refusal to leave the room, the defendant's movement of them was part of his positioning of his victims in a single location so that he could point his crossbow at all three victims simultaneously. *Id.* at 518. Accordingly, the court concluded that the state had introduced insufficient evidence to prove the charges of second-degree kidnapping. *Id.*

Returning to the present case, defendant argues that the evidence was insufficient to establish asportation because the victim was moved only a short distance (approximately 31 feet total); the purpose of the movement was to accomplish the other crimes of sodomy and assault; and there was no qualitative difference between the victim's starting and ending locations within her own apartment. The state responds that the distance of the victim's movement is not independently significant when the other circumstances of the movement support a finding that the beginning and ending locations were qualitatively different, a finding that can be made on this record because moving the victim to the bedroom and then the bathroom served to limit her freedom of movement and increase her isolation. And, the state further argues, the movement was not incidental to the commission of defendant's other crimes because it was not "inherent" in the conduct underlying those crimes.

We agree with the state. First, to the extent that defendant argues that the relatively short distance between the apartment's entryway and the bathroom precludes a finding of asportation, our caselaw forecloses that argument. As we explained in *Walch*, the distance that the victim is moved is a relevant, but not dispositive, consideration in the asportation inquiry. 346 Or at 475. Certainly, movement of a "substantial distance" is more likely to entail moving the victim "from one place to another." *Id.* However, we have noted that the phrase "from one place to another," by its terms, "does not require that a defendant take a victim a specific distance, nor does it require that the distance be substantial." *Id.* at 477 (internal quotation marks omitted). Even when the distance moved is relatively short, that movement can satisfy the asportation element when it occurs between two qualitatively distinct places. In *Walch*, for instance, we concluded that the trunk of a car was a different place than the driveway, despite the distance moved being at most 15 feet. *Id.* at 476.

The key question, as we explained in *Sierra*, is whether the victim was moved to a qualitatively different location, a question that is informed by considerations including whether the change in location served to increase

the victim's isolation and limit her freedom of movement. 349 Or at 513, 516.[2] For example, it was important to our analysis in *Murray* that the movement of the victim from the driver's seat of the vehicle to the passenger seat not only was short in distance, but did nothing to further isolate her or limit her freedom of movement. *See Walch*, 346 Or at 475-76 (describing the defendant's movement of the victim in *Murray* as "[f]ar from serving to isolate the victim or limit her freedom of movement"). Conversely, in *Walch*, the movement of the victim from the driveway to the trunk of the car, although short in distance, effected a qualitative change because the victim was moved from an open area where she could have run away or been visible to others—a driveway—to an enclosed space. *Id.* at 476. The mobile nature of the car, although not dispositive, further demonstrated the qualitative difference between the victim's starting and ending locations in that case. *Id.*

Here, defendant places great emphasis on the fact that the victim was moved within her own apartment. We are unpersuaded that, for that reason alone, no reasonable factfinder could find that a qualitative change in the victim's location occurred. Defendant relies on *State v. Wolleat*, 338 Or 469, 471, 111 P3d 1131 (2005), a case in which the defendant had moved the victim from one room of her apartment to another in the course of an assault. We held that no reasonable juror could find that the defendant "had the statutorily required intent." *Id.* at 478. Defendant argues that our holding in that case "strongly suggested" that room-to-room movement is not movement "from one place to another" for purposes of kidnapping.

Defendant's reliance on *Wolleat* is misplaced. Only the intent element of kidnapping was at issue in that case, and the only evidence of intent was the movement itself. We explained that the evidence of the movement, under the circumstances of that case, was "insufficient to establish the

---

[2] In *Sierra*, we explained that neither isolation nor control of the victim may substitute the ultimate inquiry whether the victim was moved "from one place to another," because those factors are not required by the wording of the statute. 349 Or at 516. We noted, however, that those factors are relevant to the extent that they demonstrate any qualitative difference between the victim's starting and ending locations. *Id.*

mental element necessary to prove kidnapping." *Id.* Our analysis in *Wolleat* had nothing to do with the asportation element, which was not at issue on review. We did not suggest that that same movement of a victim that occurred in *Wolleat* would be insufficient to satisfy the distinct asportation element. In fact, we observed that the phrase "from one place to another," by its terms, "does not require that a defendant take a victim a specific distance, nor does it require that the distance be substantial." *Id.* at 473. Moreover, in *Sierra*, we expressly rejected the proposition that "movement of a victim within a single structure will *never* be place-to-place movement" for purposes of the asportation element. 349 Or at 517 (emphasis in original).[3]

Here, the state introduced evidence from which a rational factfinder could determine that the relatively short distance traveled by the victim ended at a qualitatively different location. Defendant argues that, because it occurred within the victim's own residence, any qualitative difference was slight. But a rational factfinder could conclude otherwise. The entryway of the victim's apartment was a more open area compared to the primary bedroom and bathroom. At the front door of the apartment, the victim had more of an opportunity to run away or be seen or heard by others— perhaps by neighbors or her children who were sleeping in a nearby bedroom with an open door. After moving the victim from the entryway of her apartment to the primary bedroom, defendant closed the door of the children's bedroom, turned up the music in the primary bedroom, and closed the window and door of that room. He then moved the victim into the adjoining bathroom and closed the bathroom door. A factfinder could have found that defendant's actions effected a qualitative change in the victim's location by physically

---

[3] Although this court has not previously considered whether room-to-room movement within a residence may satisfy the asportation element, the Court of Appeals has done so at least twice. *Compare State v. Washington*, 266 Or App 133, 139, 337 P3d 859 (2014), *rev den*, 356 Or 767 (2015) (affirming conviction where the victim was moved from apartment entryway to "a more isolated place at the top of the stairs," where the defendant then raped her), *with State v. Opitz*, 256 Or App 521, 535, 301 P3d 946 (2013) (reversing conviction where the defendant had moved the victim around an apartment during an ongoing assault, reasoning that "the functional differences among the rooms in the victim's apartment had no effect on the extent to which [the] defendant interfered with the victim's personal liberty"). Those cases are consistent with our holding today.

moving her to a place that increased her isolation, reduced her ability to escape, and reduced the likelihood that she would be seen or heard by others nearby.[4]

Ultimately, defendant's argument rests on competing inferences about the degree to which the surrounding circumstances contributed to an increase in the victim's isolation and restricted her freedom of movement when defendant moved her to the bathroom. We reject defendant's argument that no rational factfinder could conclude that, under those circumstances, the bathroom was a qualitatively different place from the entryway. In sum, a rational factfinder could find that defendant moved the victim "from one place to another."

But, even when there is place-to-place movement between qualitatively distinct locations, our case law has required that the movement, to support a conviction for kidnapping, must not be merely incidental to the commission of another crime. *See Sierra*, 349 Or at 513-14. In our cases involving the "act" element under the asportation theory, we have evaluated the "not incidental" requirement in terms of whether the movement was an inherent or necessary component of the defendant's underlying crimes. *See id.* at 517-18. In *Sierra*, for example, we determined that the defendant's movement of the victims from one end of the convenience store to the other—all while the defendant pointed a crossbow at them—was inherent in the defendant's other crimes of unlawful use of a weapon and menacing. *Id.* at 518. Similarly, in *Murray*, the defendant's movement of the victim from the driver seat to the passenger seat of the car was part of the defendant's theft of the victim's car. *See* 340 Or

_____

[4] In *Sierra*, we noted that ORS 163.225(1)(a) and (b) provide alternative ways for the state to prove the act element of kidnapping. 349 Or at 511. Namely, the state must prove that the defendant either took the victim "from one place to another," or "secretly confine[d]" the victim in a place where the victim is unlikely to be found. *See id.* However, as we have explained, "the asportation and confinement elements are not mutually exclusive." *Walch*, 346 Or at 482 n 11; *see Sierra*, 349 Or at 516 n 6 (reiterating that point). "A defendant might well take a person from one place to another (with the requisite intent) *and* secretly confine the person where the person is not likely to be found." *Walch*, 346 Or at 482 n 11 (emphasis in original); *see id.* at 482 (explaining that "[t]he car trunk is relevant, in our view, not because it is a 'secret' place where the victim might be confined and not be likely to be found, but because it was 'another' 'place' to which defendant took the victim after he attacked her outside the house").

at 606. In *Walch*, on the other hand, we explained that the defendant had assaulted and robbed the victim, and *also* forcibly moved her into the trunk of a car, indicating that that movement was not part of the defendant's other crimes of robbery and assault. 346 Or at 479.

Those cases demonstrate that the timing and sequence of the events, in light of the other crimes that the defendant committed, are central in determining whether the defendant's movement of the victim was incidental to those crimes. In both *Sierra* and *Murray*, the defendants' movement of the victims occurred *in the course of* their commission of other substantive crimes, such that that movement was part and parcel of the conduct underlying those crimes.

Here, in addition to kidnapping, defendant was convicted of burglary, sodomy, assault, strangulation, and menacing.[5] Viewing the facts in the light most favorable to the state, we conclude that a reasonable factfinder could find that defendant's movement of the victim was not incidental to any of those other crimes.

The evidence supports a determination that defendant's movement of the victim was a distinct step in a series of events occurring over approximately 30 to 45 minutes. Defendant picked up the victim after he had completed the act of unlawfully entering her apartment. The sodomy and strangulation occurred after the movement was complete. The movement of the victim was not physically necessary to the commission of those other crimes, and, because it occurred earlier in time, a factfinder could have determined that it was not an "incidental" part of the same conduct that constituted those offenses, as was true in *Sierra* and *Murray*.

Defendant's principal argument to the contrary is that the movement of the victim was incidental because its *purpose* was to accomplish the assault and sodomy. But our asportation cases have not treated the purpose of the

_____

[5] Although it is not entirely clear from the record, the trial court appears to have based the menacing conviction on defendant's statement to the victim, after the incident was over, that he would kill her if she called the police. In his briefing, defendant states that his burglary, strangulation, and menacing convictions "do not appear pertinent to the issues on appeal."

movement as the focus of the "not incidental" inquiry. As we have explained, those cases focus the "not incidental" inquiry on whether the movement was "inherent in, or a chance or minor consequence of" other crimes. *Sierra*, 349 Or at 517. A defendant's purpose behind the movement may be relevant to understanding whether it was incidental, so understood, but it is not dispositive, particularly in a case where the defendant's state of mind is not at issue.[6]

Defendant's argument is also difficult to square with the way that the legislature has structured the kidnapping statutes. As noted earlier in this opinion, the core elements of kidnapping are set out in ORS 163.225, which defines the second-degree crime. Under a related statute, ORS 163.235, the crime is elevated to first-degree kidnapping if the defendant committed second-degree kidnapping with a specified "purpose," including "[t]o cause physical injury to the victim." ORS 163.235(1)(c). That purpose tracks the elements of fourth-degree assault, for which a person must "[i]ntentionally, knowingly or recklessly *cause[ ] physical injury to another.*" ORS 163.160(1)(a) (emphasis added). As a result, first-degree kidnapping under ORS 163.235 (1)(c) is, essentially, kidnapping for the purpose of committing assault. As the state points out, if defendant were correct that the forced movement of a victim for the purpose of accomplishing assault makes that movement "incidental" to the assault, then ORS 163.235(1)(c) would have no effect. Thus, we agree with the state that, for purposes of the asportation "act" element, whether the defendant's purpose behind the movement was to accomplish another crime is not the focus of the "not incidental" inquiry.[7]

---

[6] Although one of defendant's assignments of error below was that the evidence was insufficient to prove his intent, he did not seek this court's review regarding the intent element. Only the asportation element is at issue on review.

[7] Although the parties have not raised this issue, we observe that our case law reflects some tension as to whether the "not incidental" requirement is even properly considered as part of the asportation element, as opposed to the intent element, of kidnapping. As explained in this opinion, *Murray* and *Sierra* treated the "not incidental" requirement as part of the asportation element. However, this court also has recognized more than once that the legislature's desire to avoid convictions for "incidental" kidnappings was addressed through the intent element, not the asportation element—a point that had earlier been made in the dissenting opinion in *Murray*. 340 Or at 609-10 (Kistler, J., dissenting) (explaining that the legislature "did not change the ordinary understanding of 'asportation'" to distinguish kidnapping from conduct incidental to another crime); *see*

For the foregoing reasons, we conclude that the evidence was sufficient to permit a reasonable factfinder to find that defendant moved the victim "from one place to another" for purposes of ORS 163.225(1)(a).

### B.  *Consecutive Sentencing Statute*

Defendant next argues that the trial court erred when it imposed consecutive sentences for defendant's first-degree kidnapping and first-degree sodomy convictions. Under ORS 137.123(5), when a defendant has "separate convictions arising out of a continuous and uninterrupted course of conduct," the trial court has discretion to impose consecutive sentences for each conviction if the court makes certain findings in accordance with paragraphs (a) or (b). Paragraph (a), the only provision at issue here, requires the trial court to find "[t]hat the criminal offense for which a consecutive sentence is contemplated was not merely an incidental violation of a separate statutory provision in the course of the commission of a more serious crime but rather was an indication of defendant's willingness to commit more than one criminal offense." ORS 137.123(5)(a).

The parties dispute the meaning of the phrases "merely an incidental violation" and "willingness to commit more than one criminal offense" in paragraph (a). As a preliminary matter, we note that the "merely incidental" inquiry presented under the consecutive sentencing statute differs from the inquiry that we just discussed under the kidnapping statute. The latter is a product of our case law interpreting the intended meaning of the kidnapping statute, while the former is a product of the wording in a statute that this court has not yet construed. The parties' dispute thus presents an issue of statutory interpretation.

---

*also Walch*, 346 Or at 473-74 (explaining that the legislature addressed the "not incidental" concern through the intent element); *State v. Mejia*, 348 Or 1, 8, 227 P3d 1139 (2010) ("[T]he legislature reserved the prosecution and punishment of kidnapping for situations 'where the detention or asportation is not merely incidental to the commission of the underlying crime.' *** The intent element of kidnapping was the legislature's means to achieve that goal.").

A future case may require us to resolve that tension. In this case, however, the parties (understandably, in light of *Murray* and *Sierra*) have treated the "not incidental" requirement as relevant to the asportation analysis, and have not asked us to reconsider the holding or reasoning of any prior case. Accordingly, we adopt the same approach.

ORS 137.123 was adopted by initiative in the 1986 election as part of Ballot Measure 10, known as the "Crime Victims' Bill of Rights." Or Laws 1987, ch 2, § 1. In cases involving a statute enacted by the voters, such as here, we apply a similar method of statutory interpretation as we do to statutes enacted by the legislature, "with the goal of discerning the intent of the voters who passed th[e] initiative[ ] into law." *Hazell v. Brown*, 352 Or 455, 465, 287 P3d 1079 (2012) (citing *State v. Guzek*, 322 Or 245, 265, 906 P2d 272 (1995)). We begin with the text and context of ORS 137.123, as the text itself is "the best evidence of the voters' intent." *Guzek*, 322 Or at 265.

The statute does not define an "incidental violation" nor a "willingness" to commit more than one offense. When a statutory word or phrase is undefined, we typically assume, absent contrary indicators of intent, that the word or phrase has its "'plain, natural, and ordinary'" meaning. *Dowell v. Oregon Mutual Ins. Co.*, 361 Or 62, 69, 388 P3d 1050 (2017) (quoting *PGE v. Bureau of Labor and Industries*, 317 Or 606, 611, 859 P2d 1143 (1993)). We frequently consult "dictionary definitions in such cases on the assumption that, if the legislature did not provide a specialized definition for a term, the dictionary will help to shed light" on its intended meaning. *Id.* We do not, however, interpret statutes solely based on dictionary definitions. *Id.* at 71-72. Instead, we examine word usage in context to determine what the legislature most likely intended. *Id.* at 72.

"Incidental" ordinarily means, as relevant here, "subordinate, nonessential, or attendant in position or significance[.]" *Webster's* 1142 (unabridged ed 2002).[8] "Willingness" is defined as "the quality or state of being willing." *Id.* at 2617. The relevant definition of "willing" is "inclined or favorably disposed in mind[.]" *Id.* Defendant and the state

_____

[8] Both parties rely on the 2002 edition of *Webster's* for the definition of "incidental." We note that *Black's Law Dictionary* also defines "incidental," but neither party raised the issue of whether "incidental" is a legal term of art. We conclude that, even if it was a term of art, our analysis would not change because the definitions are substantially similar. *See Black's* 911 (11th ed 2019) (defining "incidental" as "[s]ubordinate to something of greater importance; having a minor role"); *see also Black's* 686 (5th ed 1979) (defining "incidental" as "[d]epending upon or appertaining to something else as primary").

both begin with those dictionary definitions, but they draw different conclusions from them.

Defendant contends that the phrase "merely an incidental violation" informs the meaning of the phrase "willingness to commit more than one" offense. An offense is "incidental," in defendant's view, when it is "subordinate or insignificant to a central criminal objective." Defendant concludes that a "willingness to commit more than one criminal offense" means that "the defendant was inclined to commit more than one offense and that the other offense was not a subordinate or insignificant act to accomplish a central criminal objective." Based on that interpretation, defendant argues that the trial court erred in imposing consecutive sentences because, according to defendant, the trial court found that defendant had "one central criminal objective" in kidnapping and sodomizing the victim: to exercise power and control over her. Defendant further argues that the evidence does not show a "willingness" to commit more than one offense because defendant did not "suddenly decide" to sodomize the victim after carrying her to the bedroom; rather, the evidence reflects a unitary intent, from the beginning of the incident to the end, to control the victim by kidnapping and sodomizing her.

The state agrees that the "merely incidental" phrase informs the meaning of the "willingness" phrase, arguing that, by contrasting the "merely incidental" and "willingness" phrases with "but rather," the sentence structure of the text suggests that a "willingness to commit more than one" offense is shown when the second offense is not "merely incidental" to the commission of a "more serious crime." Multiple considerations are relevant in determining whether an offense was "incidental" to a more serious crime, the state argues, including whether the second offense was necessary to commit the first offense, whether the second offense was committed with a different "intention" or conduct, and the relative seriousness of the offenses. Based on those factors, the state argues that the consecutive sentence for defendant's sodomy conviction was permissible because defendant's sodomy of the victim was not "incidental" to the kidnapping but, instead, showed defendant's "willingness" to commit more

than one offense. The state emphasizes that (1) defendant did not need to commit either crime in order to commit the other; (2) the conduct underlying each crime was completely distinct; (3) both offenses are equally serious as measured by the penalties for those crimes, and (4) the sodomy occurred after the kidnapping was already complete. The state disagrees that a defendant's "central criminal objective" is relevant to the inquiry, noting that the drafters did not include that phrase in the text of the statute. And, even if the centrality of a "criminal objective" was relevant, the state argues that the trial court made no finding that defendant had only one criminal objective, and that the evidence, in fact, permits a finding that defendant had more than one criminal objective.

Beginning with the structure of ORS 137.123(5)(a), we agree with both parties that the meaning of the "merely incidental" phrase informs the meaning of the "willingness" phrase. That is so because the statute uses the term "but rather" to connect those two phrases. The word "but" is a conjunction that is used to express a contrast. *See* Randolph Quirk *et al.*, *A Comprehensive Grammar of the English Language* 935 (1985); *see also Webster's* at 303 (defining "but" as "on the contrary * * * used to connect coordinate elements"). When a sentence includes a negation before "but," *e.g.*, the criminal offense "was *not* merely an incidental violation * * * *but rather* was * * *," the contrast expressed by "but" is an affirmative repudiation of what has already been said. Quirk, *Comprehensive Grammar* at 935. In such a case, the force of "but" can be emphasized by adding "rather" or "on the contrary." *Id.* (providing the example, "I am *not* objecting to his morals, *but rather* to his manners."); *see also* Bryan A. Garner, *A Dictionary of Modern Legal Usage* 97 (1987) (explaining that "but rather" "is usually unnecessary, either word singly doing the work that both purport to do"); *Webster's* at 1885 (defining "rather" as "to the contrary **:** instead"). Accordingly, the structure of paragraph (5)(a) suggests that, if an offense was not an "incidental" violation, then that offense, instead, indicated a "willingness" to commit more than one offense.

Turning to what it means for an offense to be an "incidental" violation or, instead, an indication of a "willingness" to commit more than one offense, we find a few

contextual clues throughout different portions of paragraph (5)(a). First, the nature of the offenses and the criminal conduct giving rise to the offenses are relevant considerations. The statute focuses the inquiry on the *offenses* that the defendant committed. And the "willingness" phrase emphasizes that an offense must indicate the defendant's willingness to commit "more than one criminal offense." Those focal points necessarily require the trial court to evaluate the offenses at issue, suggesting that the similarities and differences between the nature of the offenses and the criminal conduct giving rise to those offenses are relevant to the inquiry.

Next, the timing of the offenses is a relevant consideration. The statute precludes the imposition of a consecutive sentence for an offense that is "merely an incidental violation of a separate statutory provision *in the course of* the commission of a more serious crime." ORS 137.123(5)(a) (emphasis added). We note that subsection (5) of the statute already contemplates that the offenses arise "out of a continuous and uninterrupted course of conduct." Paragraph (a) imposes an additional temporal restriction by describing an incidental violation that occurs "in the course of"—or during—the commission of another crime. *See* Bryan A. Garner, *Modern American Usage* 477 (3d ed 2009) (explaining that "in the course of" "is often wordy for *during* or *while*"). Accordingly, the timing of the offenses is relevant to determine whether an offense was "merely an incidental violation of a separate statutory provision" or, instead, indicated a "willingness to commit more than one" offense.

Finally, the seriousness of the offenses is a relevant consideration as well. Paragraph (a) expressly describes an "incidental violation" as one that occurs during the commission of "a more serious crime." That understanding is consistent with the definition of "incidental." When an offense is "subordinate, nonessential, or attendant in position" to a more serious crime, and it occurred during the commission of that more serious crime, it is more than likely an "incidental" violation. Conversely, an offense of equal seriousness to the underlying offense is less likely to be "merely an incidental violation of a separate statutory provision."

In sum, the statute's text and context suggests that, in considering whether to impose a consecutive sentence under ORS 137.123(5)(a), the trial court should consider the similarity of the offenses and the underlying criminal conduct, the timing of the offenses, and the comparative seriousness of each offense.

Defendant maintains that, based on the definition of "incidental," an offense that is "subordinate or insignificant" to a "central criminal objective" is an "incidental violation" under the statute. Although the phrase "criminal objective" cannot be found in the text of the statute, defendant argues that the legislative history of the statute shows an intent to preclude consecutive sentences where the defendant "had one criminal objective that happened to violate multiple criminal offenses." He contends that, in this case, he had one central criminal objective in kidnapping and sodomizing the victim: to control the victim through physical force. Accordingly, consecutive sentences were not permitted for those offenses. The state responds that the text, context, and legislative history of the statute show that the defendant's central criminal objective is not the focus of the inquiry. We agree with the state.

The absence of the phrase "criminal objective" from the text of ORS 137.123 is significant because, under our statutory interpretation methodology, the text is the best evidence of a statute's intended meaning. *See Dowell*, 361 Or at 69; *Guzek*, 322 Or at 265. As we have explained, the statute here precludes a consecutive sentence for an "incidental violation" that occurred during the commission of a "more serious crime." Instead of focusing the inquiry on whether the offense was incidental to a central criminal objective, the text of the statute focuses on whether the offense was incidental to a more serious crime. Defendant's construction of the statute would require us to insert the concept of a "criminal objective" where the drafters of the statute did not include that language. *See* ORS 174.010 (when interpreting a statute, a court is "not to insert what has been omitted, or to omit what has been inserted").

Based on that understanding of the statute, the record supports the trial court's determination that the

statutory requirements for imposition of a consecutive sentence were satisfied here, and therefore, it could impose a partially consecutive sentence for defendant's first-degree sodomy conviction. Specifically, it does not appear that defendant's sodomy of the victim was a subordinate or non-essential offense that occurred during the commission of a more serious crime. First, the sexual nature of the sodomy charge is distinct from the nature of kidnapping. Next, defendant's conduct in forcing the victim to perform oral sex on him was a distinct act and a distinct type of criminal conduct from his actions in the movement giving rise to the kidnapping charge. First-degree kidnapping and first-degree sodomy are both Class A felonies, meaning they are crimes of equal seriousness. *See* ORS 163.235(2); ORS 163.405(2). And, finally, defendant's sodomy of the victim was temporally distinct from the movement and conduct giving rise to the kidnapping charge. Those factors all suggest that the sodomy was not an "incidental violation" but, instead, indicated defendant's "willingness" to commit more than one offense.

Defendant's argument to the contrary relies almost entirely on legislative history. Evaluating the history of ORS 137.123, as we will explain, is an unusual exercise. In this case, we do not find the legislative history that defendant relies on particularly useful or persuasive in determining the voters' intended meaning of the text.

As noted above, ORS 137.123 was adopted by initiative in the 1986 election as part of Ballot Measure 10, known as the "Crime Victims' Bill of Rights." Or Laws 1987, ch 2, § 1. The ballot title described the measure as "revis[ing] many criminal laws concerning victims' rights, evidence, sentencing, [and] parole." Official Voters' Pamphlet, General Election, Nov 4, 1986, 49. The consecutive-sentencing issue received little attention in the voters' pamphlet. The ballot title explanation stated that the measure "[l]imits sentence merger for multiple crimes" and "[s]ets consecutive sentence rules." *Id.* The explanation section of the pamphlet stated that Measure 10 would "[s]lightly expand circumstances under which a person may be convicted of separate offenses and may be given consecutive sentence." *Id.* at 52. In an

argument opposing the measure, the writer argued that Ballot Measure 10 was "unnecessary" because it "repeat[ed] changes already adopted by the Oregon Legislature[,]" including that "[s]eparate convictions and sentences are now required." *Id.* at 55.

The parties note that the voters' pamphlet provides little guidance as to the intended meaning of the phrases "merely an incidental violation" and "willingness to commit more than one criminal offense." Accordingly, defendant resorts to the legislative history of *former* ORS 137.122 (1985) as indicative of the intended meaning of ORS 137.123. We will briefly explain the relationship and enactment history of those two distinct yet related statutes.

In the years preceding the passage of Ballot Measure 10, courts, in the absence of statutory guidance about how to deal with multiple convictions and sentences arising from a single criminal episode, had "fashioned judicial rules" that sometimes required the consolidation (or "merger") of verdicts. *State v. Crotsley*, 308 Or 272, 276-77 & nn 3-4, 779 P2d 600 (1989). Prior to the 1986 election, several proposals were introduced as attempts to provide more statutory guidance. *Id.* at 276. One of those proposals included Ballot Measure 10, an initiative that was filed with the Secretary of State in April 1985 and contained the consecutive sentencing provision now found in ORS 137.123. *See id.* at 276 n 3; Voters' Pamphlet at 50. At around the same time, the Oregon Department of Justice and the Oregon District Attorneys Association proposed Senate Bill (SB) 257 (1985) and House Bill (HB) 2331 (1985) to the legislature, both of which contained identical consecutive sentencing provisions as Ballot Measure 10. *See Crotsley*, 308 Or at 276 n 3; Ex A, House Committee on Judiciary, HB 2331, May 27, 1985 (accompanying testimony of Deputy Attorney General William F. Gary). Thus, the consecutive sentencing provisions of Ballot Measure 10, SB 257, and HB 2331 all began in identical form, each including the same "merely incidental" and "willingness" phrases at issue here. However, while Ballot Measure 10 ultimately reached the voters in that form, SB 257 and HB 2331 were amended during the legislative process. *See Crotsley*, 308 Or at 276 n 3. Notably, the

legislature deleted the "willingness" phrase from the consecutive sentencing provisions of SB 257 and HB 2331. *See* Minutes, House Committee on Judiciary, HB 2331, May 29, 1985, 10-12.

The first provision to become law was HB 2331, which the legislature enacted, without the "willingness" phrase, in June 1985. *See Crotsley*, 308 Or at 276 n 3; Or Laws 1985, ch 722, § 2. That provision was codified as *former* ORS 137.122 (1985). *See id.* But a year and a half later, the voters passed Ballot Measure 10, which contained the same wording (with the "willingness" phrase) as the *original* HB 2331, before the legislature had amended and passed it. That provision passed by the voters was codified as ORS 137.123. Or Laws 1987, ch 2, § 12. *Former* ORS 137.122 (1985), which the legislature had passed the year before, was "impliedly repealed by ORS 137.123," and formally repealed by the legislature in 1991. Or Laws 1991, ch 67, § 28.

Defendant relies on one statement of a Department of Justice representative, Deputy Attorney General William Gary, that was made to the legislature in 1985 regarding the original version of HB 2331, which included both the "merely incidental" and "willingness" phrases. Deputy Attorney General Gary testified that the "concept" that that language was meant to "embod[y] *** is that where you have multiple offenses committed in the same course of conduct, you ought not to be making sentences consecutive if you have a person who is walking across several violations toward one central criminal objective." Tape Recording, House Committee on Judiciary, HB 2331, May 29, 1985, Tape 686.

Considering the manner in which the separate pieces of legislation described above evolved, we decline to give much weight to Deputy Attorney General Gary's testimony. There is nothing to indicate that the voters in 1986, considering a voter-initiated measure, would have been aware of discussions that occurred at the legislature a year and a half earlier regarding a different piece of legislation. Moreover, even assuming that voters in 1986 may have been generally aware that the legislature had recently enacted a consecutive sentencing statute, *former* ORS 137.122 (1985), we cannot infer that the voters intended ORS 137.123(5)(a)

to have the same meaning as *former* ORS 137.122 (1985), because those provisions contain materially different language. We see no evidence that voters were informed that ORS 137.123(5)(a) would be consistent with and somehow "revive" the text of an early version of a bill that the legislature had not approved.

## III.   CONCLUSION

We conclude that the evidence was sufficient for a rational trier of fact to find that defendant moved the victim "from one place to another" for purposes of ORS 163.225(1)(a). We further conclude that the trial court did not err in imposing a partial consecutive sentence under ORS 137.123(5)(a).

The decision of the Court of Appeals and the judgment of the circuit court are affirmed.