326 September 25, 2025 No. 40

IN THE SUPREME COURT OF THE
STATE OF OREGON

STATE OF OREGON,
*Respondent on Review,*

*v.*

ANDREW ANDERSON,
*Petitioner on Review.*

(CC 19CR28984) (CA A177245) (SC S070956)

On review from the Court of Appeals.*

Argued and submitted November 19, 2024.

Per C. Olson, Hoevet Olson, P.C., Portland, argued the cause and filed the briefs for petitioner on review. Also on the briefs were Megan E. McVicar.

Kirsten M. Naito, Assistant Attorney General, Salem, argued the cause and filed the brief for respondent on review. Also on the brief were Ellen F. Rosenblum, Attorney General, and Benjamin Gutman, Solicitor General.

Before Flynn, Chief Justice, and Duncan, Garrett, DeHoog, James, and Masih, Justices, and Balmer, Senior Judge, Justice pro tempore.**

MASIH, J.

The decision of the Court of Appeals is affirmed in part and reversed in part. The judgment of the circuit court is affirmed in part and reversed in part, and the case is remanded to the circuit court for further proceedings.

_____

\* Appeal from Deschutes County Circuit Court, Beth M. Bagley, Judge. 329 Or App 754, 542 P3d 449 (2023).

\*\* Bushong, J., did not participate in the consideration or decision of this case.

**MASIH, J.**

Defendant was convicted of second-degree kidnapping and menacing. The Court of Appeals, sitting en banc, affirmed the convictions, but with several judges dissenting as to various parts of the opinion. *State v. Anderson*, 329 Or App 754, 542 P3d 449 (2023). We allowed review. As we now explain, we agree with defendant that the trial court should have granted defendant's motion for judgment of acquittal on the kidnapping charge, because the evidence was not sufficient to allow a reasonable factfinder to conclude that defendant had taken the victim "from one place to another," as that phrase is used in ORS 163.225(1)(a). We reverse the Court of Appeals and the trial court on that point. However, we affirm as to the menacing conviction. We also affirm as to a third issue, involving the trial court's ruling on a motion *in limine*.

## I.   PRELIMINARY FACTS

Before moving to the legal issues presented before this court, we begin with a brief summary of the background of the charges against defendant. Defendant and his then-wife, J, lived in Deschutes County during the relevant period. They had a tumultuous marriage, ultimately leading to J petitioning for a restraining order against defendant and defendant subsequently filing for divorce. The charges against defendant arose from separate incidents that occurred in December 2016 and July 2017. For his alleged conduct during those incidents, defendant was charged (as relevant here) with second-degree kidnapping and menacing. Those charges were pleaded as constituting domestic violence. Beyond that, however, there is almost no overlap in the facts concerning the kidnapping charge or the facts that relate to the menacing charge, and the facts regarding the motion *in limine* are largely independent of either.

To make this opinion easier to follow, therefore, we organize it around the issues on review: the kidnapping charge, the menacing charge, and the ruling on the motion *in limine*. Within each of those issues, we will set out the relevant facts, discuss the trial court's holding and the Court of Appeals' ruling, and then explain our conclusion.

## II.  KIDNAPPING

### A.  *Standard of Review*

The legal issue regarding the second-degree kidnapping charge turns on whether the trial court should have granted defendant's motion for judgment of acquittal. A trial court must grant such a motion if the evidence and its reasonable inferences would not permit a rational trier of fact to find the elements of the crime beyond a reasonable doubt. *E.g.*, *State v. Wallace*, 373 Or 122, 125-26, 561 P3d 602 (2024); *State v. Hedgpeth*, 365 Or 724, 730, 452 P3d 948 (2019). Accordingly, we set out the facts and inferences in the light most favorable to the state. *See, e.g.*, *State v. Soto*, 372 Or 561, 563-64, 551 P3d 893 (2024) (so explaining).

### B.  *Facts; Trial Court Ruling; Court of Appeals' Decision*

The kidnapping charge was based on events that occurred between 8:00 and 9:00 a.m. one morning in late December 2016, at the house owned by defendant and J in Deschutes County. J was lying on the bed in the master bedroom when defendant yelled at her to get out of the room. J, who was wearing only a robe and underwear, refused to leave. Defendant then grabbed J by the hood of her robe and dragged her outside. That involved dragging J a total of about 50 feet: around the bed, through the hallway and the foyer, out the front door, across the deck and down the steps, and about five feet into the yard.

It was about 20 degrees Fahrenheit outside, and the grass was covered with ice and snow. There were neighboring homes, and while the distance to those homes was unclear, J indicated at trial that some neighbors were close enough to "see everything" on the property. J attempted to reenter the house, but she was unable to do so because defendant was holding the door closed.[1] After five to 10 minutes, J remembered that her car was unlocked and used the car's garage door opener to reenter the house.[2]

---

[1] The door did not require a key; it had a keypad entry, but it did not open when J entered the code. The jury could infer, as did J, that defendant was physically preventing the door from opening.

[2] The parties also stipulated that there was a keypad entry for the garage on the side of the garage door.

Approximately three years later, in 2019, the state charged defendant with second-degree kidnapping based on those events. The second-degree kidnapping statute, ORS 163.225, provides, in relevant part:

"(1)   A person commits the crime of kidnapping in the second degree if, with intent to interfere substantially with another's personal liberty, and without consent or legal authority, the person:

"(a)   Takes the person from one place to another[.]"

Defendant moved for a judgment of acquittal on the kidnapping charge. He contended that the state had failed to present enough evidence for a rational factfinder to conclude either that defendant had taken J "from one place to another" or that defendant had the required intent to "substantially interfere" with J's liberty. The trial court denied the motion.

After defendant was convicted, he appealed, challenging his kidnapping conviction on a number of grounds, including renewing his contention that the trial court should have granted his motion for judgment of acquittal.[3]

The Court of Appeals, sitting en banc, affirmed the kidnapping conviction by a split decision. The majority concluded (among other things) that the evidence was sufficient to support a finding that defendant had taken J "from one place to another," because of the qualitative differences between J's starting location and her ending location. *Anderson*, 329 Or App at 758-59. As the majority explained:

"By moving J from a protected setting in which she was warm and clothed with access to heat, electricity, and plumbing, to a setting unprotected from the elements, which were extreme at the time, with no clothing or shoes on or available to enable her to safely get to someone who might help, the jury could rationally infer beyond reasonable doubt that the move isolated J and limited her ability to move freely about."

---

[3] Defendant raised five assignments of error as to the kidnapping conviction. The first assignment of error challenged the denial of the motion for judgment of acquittal, 329 Or App at 756; the second through fourth challenged the jury instructions, *id.* at 761; and the seventh contended that the sentence for kidnapping was unconstitutionally disproportionate, *id.* at 764. Given our conclusion on the first assignment, we do not need to address defendant's other arguments regarding the kidnapping conviction, or the other aspects of the Court of Appeals' decision regarding that conviction.

*Id.* at 759. The majority also concluded that there was sufficient evidence for a rational factfinder to conclude that defendant had the required intent to substantially interfere with J's liberty. *Id.* at 759-61.

The dissent questioned the majority's conclusion regarding the required act, noting that it was unclear "what 'quality' renders a place 'qualitatively different' from another place," but that prior case law "has focused on the qualities of isolation and ease of control." 329 Or App at 774 (Aoyagi, J., dissenting). The dissent disagreed that the facts showed the required act, noting that "defendant actually had less control over J outside." *Id.* at 776. Assuming that the act element was met, however, the dissent nevertheless concluded that the evidence was insufficient to support the element of intent. *Id.* at 776-78 (Aoyagi, J., dissenting).[4]

C.  *Analysis*

1.  *Overview*

The statute setting out the crime of second-degree kidnapping is ORS 163.225. It provides, in part:

"(1)   A person commits the crime of kidnapping in the second degree if, with intent to interfere substantially with another's personal liberty, and without consent or legal authority, the person:

"(a)   Takes the person from one place to another; or

"(b)   Secretly confines the person in a place where the person is not likely to be found."

The question presented here involves one of statutory interpretation. In construing a statute, we seek to identify the intent of the legislature that enacted it. ORS 174.020; *see, e.g.*, *State v. Parkerson*, 371 Or 716, 722, 541 P3d 874 (2023) (so explaining). In doing so, we give primary weight to the statutory text in context, with appropriate additional weight accorded to any relevant legislative history. *See, e.g.*, *Parkerson*, 371 Or at 722; *City of Portland v.*

---

[4] As noted, the majority also had concluded that the trial court did not commit error in instructing the jury regarding the kidnapping charge, and that defendant's sentence for kidnapping was not disproportionate. *Anderson*, 329 Or App at 761-66. The dissent disagreed with the majority regarding the jury instruction. *Id.* at 778-80 (Aoyagi, J., dissenting).

*Bartlett*, 369 Or 606, 610, 509 P3d 99 (2022); *State v. Gaines*, 346 Or 160, 171-72, 206 P3d 1042 (2009). When evaluating the statutory text and context, we also consider our case law interpreting the statute at issue. *See, e.g.*, *State ex rel Torres-Lopez v. Fahrion*, 373 Or 816, 826 n 8, 572 P3d 1045 (2025); *Parkerson*, 371 Or at 725.

The second-degree kidnapping statute has been interpreted by this court on a number of previous occasions: *State v. Garcia*, 288 Or 413, 605 P2d 671 (1979); *State v. Murray*, 340 Or 599, 136 P3d 10 (2006); *State v. Walch*, 346 Or 463, 213 P3d 1201 (2009); *State v. Sierra*, 349 Or 506, 254 P3d 149 (2010), *adh'd to as modified on recons*, 349 Or 604, 247 P3d 759 (2011); and *Soto*, 372 Or 561. We have not been asked to overrule those precedents, so, under the doctrine of *stare decisis*, we adhere to their interpretations of the kidnapping statutes. *See Farmers Ins. Co. v. Mowry*, 350 Or 686, 693-98, 261 P3d 1 (2011) (discussing precedential effect of prior cases interpreting statutes, and outlining limited circumstances in which they will be overruled). Accordingly, our analysis will focus on the analysis as reflected in those cases.

We begin with a brief summary of the origin and development of Oregon's kidnapping statute before turning to the text and context of the current statute.

At common law, kidnapping had a relatively narrow definition that required (among other things) that the victim be removed from the country entirely. *See Walch*, 346 Or at 469 (citing William Blackstone, 4 *Commentaries on the Laws of England* *219 (1769)). In the United States, the criminal laws had steadily loosened that definition. *See id.* at 469-70 (so discussing). It eventually became so broad that even small movements and short periods of confinement incidental to committing another crime could serve as the basis for a kidnapping charge. Commentary to Criminal Law Revision Commission Proposed Oregon Criminal Code, Final Draft and Report § 99, 99-100 (July 1970) (Commentary); *see Walch*, 346 Or at 470 (same). And even as the definition of kidnapping became broader, legislation made kidnapping one of the most severely punished criminal offenses, increasing from a misdemeanor at common law

to a felony punishable by life imprisonment or death in forty-eight states by the early 1950s. Criminal Law Revision Commission, Article 12, Preliminary Draft No. 6, Oct 1968. That sometimes led to defendants being charged with kidnapping for the purpose of obtaining the death penalty or life imprisonment for crimes that otherwise would not have been subject to that penalty. Commentary, § 99 at 100 (giving as example *People v. Chessman*, 38 Cal 2d 166, 238 P2d 1001 (1951)).

In 1967, the Oregon Legislature created the Criminal Law Revision Commission, which took on the task of modernizing and revising the criminal code. Or Laws 1967, ch 573, §§ 1-2. The commission ultimately submitted a Proposed Oregon Criminal Code to the legislature, which the legislature enacted with modifications in 1971. *See* Or Laws 1971, ch 743. One part of that revision included the present kidnapping statutes, ORS 163.225 and ORS 163.235. Or Laws 1971, ch 743, §§ 98-99.[5]

In drafting the kidnapping statutes, the Criminal Law Revision Commission had intended to curb the expanded definitions of kidnapping. Commentary § 99 at 99-100; *see Walch*, 346 Or at 470-71; *Murray*, 340 Or at 604-05 (same). Unfortunately, the commentary is "more explicit about the tests that [the drafters] rejected than about the test that they eventually adopted." *Walch*, 346 Or at 471. The commentary noted that New York required that the victim be confined for at least 12 hours, while the Model Penal Code required (in part) that the victim be taken a substantial distance or confined for a substantial period in a place of isolation—but the drafters did not entirely adopt either. Commentary § 99 at 100; *see Walch*, 346 Or at 471-73 (commission had rejected outright New York's 12-hour requirement; commission had used Model Penal Code's "substantial distance" requirement in early drafts, but later removed it from act requirement and instead made it part of mental state).

_____

[5] The second-degree kidnapping statute, ORS 163.225, was amended in 2005. Or Laws 2005, ch 22, § 111. The first-degree kidnapping statute, ORS 163.235, was amended in 2005 and in 2009. Or Laws 2005, ch 22, § 112; Or Laws 2009, ch 660, § 43. Those amendments are not relevant to any of the issues presented here.

Where both New York and the Model Penal Code had sought to prevent the perceived prosecutorial overreaching mentioned above by limiting the act element of the crime, the Oregon drafters chose to accomplish that goal through the intent element. Rather than require that the victim be actually moved a specific distance or actually confined for a specific time period, Oregon's drafters instead required that the defendant *intend* substantial movement or confinement. *See Walch*, 346 Or at 473 (statute does not actually require that victim be moved a substantial distance or confined for a substantial period of time, "but rather [the defendant] must *intend* either to move the victim a substantial distance or to confine the victim for a substantial period of time" (emphasis in original; internal quotation marks omitted)).

As finally enacted, ORS 163.225 requires both a physical act and a mental state. *See State v. Wolleat*, 338 Or 469, 473, 111 P3d 1131 (2005) (so noting). A person may commit the crime by two different physical acts: either "tak[ing]" the victim somewhere (paragraph (1)(a)), or "secretly confin[ing]" the victim somewhere (paragraph (1)(b)). *See Soto*, 372 Or at 567 (so noting); *Sierra*, 349 Or at 511 (same). Whichever physical act was involved, the person must have acted with the mental state of intending to interfere substantially with the victim's liberty. ORS 163.225(1); *see Sierra*, 349 Or at 511 (same).[6] And "when the legislature prohibited performing either of those acts with the intent to interfere substantially with another's 'personal liberty,' it did not use the term 'liberty' in its broad sense. Rather, the legislature intended to refer more narrowly to interfering with a person's liberty to move freely." *Wolleat*, 338 Or at 474.

## 2. *Asportation*

Here, defendant was charged with kidnapping under paragraph (1)(a), by "tak[ing] the person from one place to another"—an element that we have traditionally referred to as "asportation." *See Sierra*, 349 Or at 511 (noting the practice). As we will explain, we conclude that the evidence was

---

[6] The statute also requires the absence of "consent or legal authority." *See Sierra*, 349 Or at 511 (characterizing that as element of crime). That requirement is not at issue here, so we will not discuss it further.

insufficient to meet the asportation element, and so the trial court should have granted a judgment of acquittal on that count. We therefore do not need either to consider a second potential aspect of the asportation element or to discuss the intent element of kidnapping.[7]

Textually, the asportation element—"[t]akes the person from one place to another"—provides little meaningful guidance. Determining when a person has been "take[n] from 'from one place to another'" is, as this court explained in *Murray*, "an exercise in metaphysics":

> "The words 'from' and 'to' create no problem here, because they clearly describe the idea of movement, *i.e.*, of a change of position. And 'another' simply replicates 'place'—*i.e.*, the statutory phrase fairly may be paraphrased as a matter of standard English to require that a person be moved 'from place to place.' Thus, in the final analysis, this case comes down to the question of how one is to define the term 'place' for the purposes of ORS 163.225(1)(a).

> "And here is where the metaphysics problem arises. The criminal code, of which ORS 163.225 is a part, contains no definition of 'place.' Absent a special definition, we ordinarily would resort to dictionary definitions, assuming that the legislature meant to use a word of common usage in its ordinary sense. *** But resort to a dictionary gets us nowhere here. 'Place' is defined, in *Webster's Third New Int'l Dictionary* 1727 (unabridged ed 2002), as 'an indefinite region or expanse.' Such a definition hardly can be said to clarify the issue."

340 Or at 603-04; *see Sierra*, 349 Or at 513 (explaining that court has found it "somewhat vexing" to determine "the legislature's intended meaning of the word 'place'").

We have concluded that the relevant question is whether "the defendant changes the position of the victim such that, as a matter of situation and context, the victim's ending place is qualitatively different from the victim's

---

[7] As we summarized in *Soto*, the asportation element has two distinct requirements. 372 Or at 567. We only need to address one in this opinion: movement of the victim. *Id.* In some cases, however, there is a second requirement: that the movement was not incidental to the commission of another crime. *Id.* Here, the parties do not suggest that defendant's movement of J was incidental to a separate crime, and so we need not consider the second requirement further.

starting place." *Sierra*, 349 Or at 513; *see Soto*, 372 Or at 567 (quoting *Sierra*); *Murray*, 340 Or at 606 (explaining that "the 'place' in which something or someone may be found and from which that something or someone may be taken is situational and contextual").

One consideration in determining whether there was asportation is the distance that the victim had been moved. *Soto*, 372 Or at 569; *Walch*, 346 Or at 475. Minimal movement often will not be enough to constitute asportation. *See Sierra*, 349 Or at 516 (characterizing it as "problematic" to find asportation from "minimal movement that effectuates little change in the victim's position—such as, for example, movement requiring one to step to the side, or move from a standing position to a sitting or lying position"). But distance must be evaluated with care, because the asportation element does not require that the movement be a substantial distance. As we have noted, both the text and history of the asportation element demonstrate that the legislature did not intend the requirement of movement "from one place to another" to mandate that the victim be moved a substantial distance. *Walch*, 346 Or at 473; *see also id.* at 474 (noting that legislature had considered and rejected "substantial distance" requirement for asportation element); *id.* (legislative history confirms that "the phrase 'from one place to another' means something different than 'substantial distance'"); *Wolleat*, 338 Or at 473 (asportation element "does not require that a defendant take a victim a specific distance, nor does it require that the distance be substantial"). As noted previously, the substantiality of the movement of the victim is an aspect of kidnapping's intent element, not its act element. *See Walch*, 346 Or at 473, 480-81 (so explaining). While the act of moving the victim a substantial distance may be sufficient to meet the act element, it is not necessary.

A critical consideration is whether the movement of the victim "increases [the] defendant's control over the victim, or isolates the victim from the view of others." *Soto*, 372 Or at 571; *see Sierra*, 349 Or at 516 (same); *see also Walch*, 346 Or at 475 (one "important factor" in asportation is "whether the movement served to limit the victim's freedom

of movement and increase the victim's isolation"). That, then, is the nature of the qualitative change that must occur between the victim's starting and ending points. *See Soto*, 372 Or at 567 (noting requirement of qualitative change); *Sierra*, 349 Or at 513 (same).[8]

Finally, we have explained that the degree of force used by the defendant usually is not relevant to the asportation element. *See Sierra*, 349 Or at 516 (concluding that that is so "because the asportation element is defined in terms of relative movement" and not amount of force).

With that summary of how we have interpreted the asportation element, we now briefly recap how this court has applied those considerations to particular cases.

In *Murray*, the victim was sitting in the driver's seat of her car in a parking lot when the defendant forced his way into the driver's seat, pushing the victim into the passenger seat. 340 Or at 601-02. The victim opened the passenger door and left as the defendant told her to get out. *Id.* at 602. In its analysis of the situation and context, this court noted that the movement of the victim was incidental to the defendant committing another crime; that there was no evidence that the defendant had tried to keep the victim in the car; that the defendant did not try to "take" the victim anywhere; and that the victim had only been moved a

---

[8] While control or isolation can be critical to the analysis, the victim usually must also be moved in more than a minimal way. That is illustrated by our decision in *Sierra*. Again, *Sierra* had noted that it would be "problematic" to find asportation from such "minimal" movements as "requiring one to step to the side, or move from a standing position to a sitting or lying position." 349 Or at 516. *Sierra* then added:

> "[B]ecause neither isolation nor control of the victim is required by the wording of ORS 163.225(1)(a), those considerations cannot be substituted for the ultimate inquiry whether the victim was moved from one place to another."

*Id.*

In context, we understand *Sierra* to hold that minimal movements are unlikely to qualify as movement "from one place to another," even if the movement may also have increased the victim's isolation or limited their freedom of movement. The victims in *Sierra* had been moved from the front of the store to behind a desk and then made to kneel. Both those things would have increased the victims' isolation and limited their freedom of movement. But the movement was minimal because it occurred entirely within a single room, so *Sierra* concluded that that movement did not amount to asportation.

minimal distance. *See id.* at 606.[9] Accordingly, this court held that the trial court should have granted the defendant a judgment of acquittal on the second-degree kidnapping charge. *Id.* at 607.

In *Walch*, the defendant had dragged the victim 15 feet across her driveway and forced her into the trunk of a car. 346 Or at 476. In determining whether the asportation element had been met, the court evaluated both the victim's starting point and ending point, as well as the distance. The victim's starting position was in her driveway, "an open area from which she might have run away or been seen by the people inside the house." *Id.* When the defendant attacked the victim, he moved her 15 feet. *Id.* As to the endpoint of the movement, this court emphasized two things. First, the victim was placed into a car, "a location (and an object) intended to quickly move people a distance of some miles." *Id.* Second, the victim was specifically placed into the trunk of the car, "a place in which *** a human being could be put for almost no innocent purpose." *Id.* (internal quotation marks and citation omitted). Because the defendant had "moved the victim from one place (the open driveway) to a qualitatively different, more mobile and isolated place (the trunk of a car)," the court held that there had been asportation. *Id.*

In *Sierra*, the defendant had become offended by the statement of a convenience store clerk and decided to scare the clerk into apologizing. 349 Or at 509. The defendant got a crossbow and forced the clerk back into the store, making him kneel behind a desk. *Id.* The second-degree kidnapping charges against defendant were based on what happened when two off-duty employees of a youth correctional facility entered the store. *Id.* at 509-10. The defendant first ordered them to leave; when they refused, the defendant ordered them to move behind the desk and kneel beside the clerk, then proceeded to yell and point the crossbow at them. *Id.* at 510.

---

[9] Regarding the distance the victim had been moved: The *Murray* opinion had framed that as the victim *not* having been moved a *substantial* distance. 340 Or at 606. In a later opinion, this court would explain in detail that *Murray*'s framing should not be read as a holding that the act requires the victim to have been moved a substantial distance. *See Walch*, 346 Or at 479-81 (reviewing the legislative history cited by *Murray* as well as prior case law on the point, and explaining that *Murray* had created an "inaccurate impression").

As to the off-duty corrections employees, this court concluded that there was not enough evidence for a rational factfinder to find asportation. *Id.* at 518.[10] The beginning and ending locations were within the same room of the same building. *Id.* at 517. Although there were "brief physical movements," they were "changes of position and posture in the same general place, not a movement of victims to a qualitatively different place." *Id.* Moreover, this court explained, the movement appeared incidental to the defendant's independent crimes of unlawful use of a weapon and menacing. *Id.* at 517-18.

Our most recent decision on asportation issued last year. In *Soto*, the victim had lived in a three-bedroom apartment with her children. 372 Or at 564. When the victim opened her apartment door to a knock, the defendant pushed into the apartment and grabbed the victim. *Id.* He carried the victim to her bedroom, where he threw her on the bed. *Id.* He closed the window, closed the door to the bedroom of the victim's children, and turned up the volume on the television before dragging the victim into a bathroom attached to that bedroom. *Id.* The total distance that the defendant moved the victim was about 31 feet. *Id.* at 572.

This court agreed with the state that there was sufficient evidence for a factfinder to find asportation. "The key question," this court explained, was "whether the victim was moved to a qualitatively different location, a question that is informed by considerations including whether the change in location served to increase the victim's isolation and limit her freedom of movement." *Id.* at 572-73. The victim had only been moved a short distance, but while that was relevant, it was not controlling. *Id.* at 572. Nor was the mere fact that the victim had been moved within her own apartment determinative. *Id.* at 573. Instead, the controlling consideration was that the defendant had moved the victim between qualitatively different locations: the more open location at the door, to the more isolated location in the bedroom and later the associated bathroom. As this court explained:

---

[10] The defendant did not dispute that, as to the convenience store clerk, the state had presented sufficient evidence to support a finding of asportation. *Sierra*, 349 Or at 518 n 10.

"The entryway of the victim's apartment was a more open area compared to the primary bedroom and bathroom. At the front door of the apartment, the victim had more of an opportunity to run away or be seen or heard by others— perhaps by neighbors or her children who were sleeping in a nearby bedroom with an open door. After moving the victim from the entryway of her apartment to the primary bedroom, defendant closed the door of the children's bedroom, turned up the music in the primary bedroom, and closed the window and door of that room. He then moved the victim into the adjoining bathroom and closed the bathroom door. A factfinder could have found that defendant's actions effected a qualitative change in the victim's location by physically moving her to a place that increased her isolation, reduced her ability to escape, and reduced the likelihood that she would be seen or heard by others nearby."

*Id.* at 574-75.

   3.  *Application*

    With that background, we now apply those principles to this case. Again, the question before us is whether a rational factfinder could find that the defendant had "take[n] J from one place to another"—not as those words might be understood in ordinary speech, but within the technical legal meaning of that phrase as used in the second-degree kidnapping statute. As we will explain, we agree with defendant that the evidence presented by the state was insufficient to support such a finding.

    Again, the "key question" for the asportation element is whether defendant took J from one place to another, "qualitatively different" place. *Soto*, 372 Or at 572; *Sierra*, 349 Or at 513. We acknowledge that the distance that J was moved here was not minimal, and that there were some qualitative differences between the starting and ending points, as the Court of Appeals' majority noted: the starting place was warm and inside, while the ending place was cold and outside. *Anderson*, 329 Or App at 759.

    But we have also explained that the qualitative change between places is evaluated in terms of the overall purpose of the kidnapping statute: to "protect[] the victim's personal liberty or freedom of movement." *Walch*, 346 Or at

475 (internal quotation marks and citation omitted). Thus, the movement generally must have "served to limit the victim's freedom of movement and increase the victim's isolation." *Id.*; *see Soto*, 372 Or at 572-73 (same).

That consideration limits both the qualities that we consider and the direction in which the qualitative change occurred. That is shown by both *Murray* and *Walch*, which involved movement with starting points and ending points that were inside and outside a car. In *Walch*, the starting point was outside the car, and the ending point inside the trunk; the movement thus increased the victim's isolation, and the trunk restricted her freedom of movement. Accordingly, we found that the asportation element had been met. In *Murray*, by contrast, the movement was from inside the car to outside, and the endpoint was the parking lot of a store. The movement thus *decreased* the victim's isolation and *increased* her freedom of movement: she was less isolated and more visible at the endpoint, and she could move much more freely than while seated in her vehicle. And while this court did not frame the analysis in *Murray* in that way, it held—consistently with what we have explained—that the asportation element had not been met.

Applying those considerations here, we conclude that, although J was moved to a location that was qualitatively different in some respects, it was not qualitatively different in ways that support a conviction for kidnapping, because—as offensive as the conduct was—it did not serve to increase J's isolation or restrict her freedom of movement. On the contrary, she was moved from an interior location, where her movements were subject to at least some structural constraints (so long as she chose to remain inside) and where she would not have been visible to neighbors or passersby, to an outside location where she was visible to the public (as noted, the record reflects that the property had neighbors) and where she could travel in any direction she chose.

The Court of Appeals' majority placed weight on the below-freezing temperature outside, and the fact that J was barefoot and unclothed.[11] *Anderson*, 329 Or App at 760-61.

---

[11] The record reflects that J was in her underwear and had a robe that defendant had pulled off J's body and thrown on the grass next to her.

We agree that those facts would have contributed to J's sense of humiliation, as the Court of Appeals reasoned, but they fall short of showing that J was made more isolated or had her freedom of movement constrained as we have applied those concepts in our case law. It is significant, we reiterate, that J was moved to a *more* exposed location, during the day, with neighbors in some proximity, and with J able to access her car to ameliorate the effects of the cold or use the garage door opener to reenter the house. And as previously noted, the parties had stipulated that there was a keypad next to the garage door that would also allow entry to the garage.

In short: considering the facts in the light most favorable to the state, we nevertheless conclude that no reasonable factfinder could find that defendant had moved J "from one place to another" as that phrase is used in the second-degree kidnapping statute. The trial court should have granted defendant's motion for judgment of acquittal.

### III.   MENACING

As with the kidnapping charge, we must consider whether the evidence—considered in the light most favorable to the state—would allow a reasonable factfinder to find all the elements of menacing.

The menacing charge was based on events that occurred in July 2017—seven months after the events charged as kidnapping. J, who was driving home, was talking on the phone with defendant when he became angry with her. When she arrived, she parked, got out of the car, and told defendant that she was going away for a few days for "some space." Defendant got angry and began yelling. Using a power drill, he drilled into the side of the J's car, then drilled into both tires on the driver's side, leaving them flat. He also threw a Bluetooth speaker at the car hard enough to leave a dent. When J objected to what defendant was doing to her car, defendant told her that she was "lucky he did it to the car and not to [her]."[12]

---

[12] J testified that she was so frightened that defendant might hurt her that she remained outside so that she would have a chance to run to a neighbor's house. When J told defendant sometime shortly afterward that she was afraid he would kill her someday, defendant responded: "If I was going to kill you, I'd bury you in the woods and cover your body with lye, and nobody would ever find you."

Defendant was charged with menacing under ORS 163.190. That statute provides, in relevant part:

> "A person commits the crime of menacing if by word or conduct the person intentionally attempts to place another person in fear of imminent serious physical injury."

Defendant moved for a judgment of acquittal on the menacing charge, contending that defendant's violence was entirely directed to the car instead of J, and so no reasonable factfinder could find that defendant intended to create in J a "fear of imminent serious physical injury." The trial court denied the motion, explaining that defendant's words and conduct, considered as a whole, would permit the jury to "infer that all of those things were said and done for the purpose of placing [J] in fear that defendant *** would cause her serious physical injury imminently."

On appeal, defendant renewed his contention that menacing could not be shown by defendant merely drilling into J's car and tires without affirmatively brandishing the drill at her. The Court of Appeals, again by a split opinion, affirmed that conviction as well. *Anderson*, 329 Or App at 766-68. The majority concluded that defendant's acts and words, taken together, would allow a rational factfinder to find that defendant intentionally caused J to fear for her safety. *Id.* at 767-68 (defendant's acts and words "could lead a rational jury to conclude, beyond a reasonable doubt, that he was threatening J and that his threat was not empty, but was instead a threat of serious and imminent harm"). The dissent disagreed; in its view, violence against an object does not "place a person in fear of imminent serious physical injury" unless either the violent act itself risked striking J, or the defendant then took some additional step to affirmatively suggest an intent to then shift the violence to J. *Id.* at 781-82 (Aoyagi, J., dissenting).

We previously interpreted the menacing statute in *State v. Garcias*, 296 Or 688, 679 P2d 1354 (1984). To address the claim that menacing violated the Oregon Constitution's protection of free speech, this court extensively reviewed

---

As we will explain, our resolution here does not depend on those additional facts: Defendant's actions were already sufficient to allow a reasonable factfinder to find menacing.

the history of the crime of assault and the development of menacing as part of the revisions to the Oregon Criminal Code. *Id.* at 692-98; *see* Commentary, § 95 at 96-97 (briefly discussing background and justification for creating "new offense of menacing"). This court summarized the "concern" of the statute as "preventing harm to the victim in the form of tension, alarm and whatever injury may result from the confrontation." *Garcias*, 296 Or at 697. Even words alone are sufficient, provided that they are being used "as a means to attempt to evoke fear of assault in the hearer." *Id.* at 698. The statute implies a "hostile relationship between the actor and victim" and requires that "the threatened harm must be imminent and serious." *Id.* at 699.

We understand defendant's position to be that defendant's violent actions here were "directed entirely" at the car and not J. His statement that J was "lucky" conveyed that he did not intend to hurt her.

We disagree. It would be possible for acts similar to defendant's to be unrelated to any threat to a person—if, for example, someone engaged in a mere act of vandalism near another, or if the person attacked the car because they were frustrated and angry with *the vehicle*. But defendant's acts here were not of that nature, and they were not disconnected from each other. They were part of a single, larger context, and a rational factfinder could consider them as a whole.

In this case, defendant's anger and frustration were directed, solely and specifically, at J. The jury could rationally conclude that defendant demonstrated his willingness to commit immediate violence against J by carrying out an act of actual violence, in her presence, against a proxy for her: her car. The degree of defendant's violence was not trivial, but substantial: He used a power drill to flatten two tires, and then he threw a heavy object to dent the vehicle. Moreover, defendant's act of flattening two tires could rationally be interpreted as defendant having intended to deprive J of a way to escape his rage and potential violence. Defendant's statement not only confirmed to J that she was the target of his anger, it also showed that defendant was ready and willing to make her the immediate target

of violence—she was, by his own words, "lucky" he had not already done so.

Defendant's targeted anger at J, his actual violence against J's property in her immediate presence, and his words confirming his intent to make her feel threatened and at his mercy, are sufficient to support a finding that defendant intentionally attempted to place—and did place—J in fear of imminent serious physical injury. The trial court correctly denied the motion for judgment of acquittal.

## IV.   MOTION IN LIMINE

Defendant's final issue on review relates to the trial court's ruling that granted, in part, a motion *in limine* filed by the state. The parties dispute the scope of the motion and the trial court's ruling, both of which we discuss further below.

The motion related to whether defense counsel would be permitted to present evidence and argument suggesting that J might have fabricated the allegations to gain a tactical advantage in their marital dissolution proceeding. The marital dissolution proceeding had been filed by defendant after J left him, returned to her parents' home in California, and filed for a restraining order against defendant within weeks of the July 2017 incident charged as menacing.

In the trial court, in the Court of Appeals, and here, the parties have consistently distinguished between the subjective and the objective aspects of that contention: the difference between whether J *believed* she might obtain a tactical advantage, versus whether J *in fact and in law* actually would obtain a tactical advantage. On review, defendant's argument is premised on the trial court having allegedly prohibited defense counsel from arguing that J subjectively believed she would gain a tactical advantage. Defendant's brief here summarizes his position as follows:

> "[D]efendant should have been permitted to ask the jury to draw the inference that J made the allegations of abuse because she believed that she would gain a tactical advantage in the looming dissolution matter."

Defendant's brief repeatedly emphasizes that focus on J's subjective beliefs, arguing that defendant should have been permitted to ask the jury to infer that J "subjectively believed" she would benefit; contending that defendant had argued in the trial court that the issue was J's "subjective belief" at the time; asserting that the Court of Appeals had held defendant had made no offer of proof that J "would testify that she believed" she would benefit; and asserting that defendant should not be required to ask J directly to "admit that she believed" she would benefit.

Defendant bases his contention that the trial court excluded argument about J's subjective beliefs on the following statement:

> "[U]nless and until I hear something further and more specific about why and how the domestic relations case should be drawn into this and how any sort of testimony or evidence, you know, would establish a tactical advantage, *real or perceived*, in the dissolution, that is not an area that I'm going to allow inquiry into."

(Emphasis added.)

We do not agree with defendant's understanding of the trial court's ruling. The statement that defendant relies on came at the very end of an extensive colloquy between defendant, the prosecutor, and the trial court—a colloquy that covers nearly 40 pages of transcript. But the trial court's other statements, in context, show that the court only prohibited defendant from arguing that J *objectively* received a tactical advantage from the allegations. The trial court simply misspoke when it referred to a "perceived" tactical advantage.

As a preliminary matter, the state itself had expressly stated that it was "fair game" for defense counsel to present evidence of J's subjective beliefs about whether she might obtain a tactical advantage in the dissolution proceeding. The trial court agreed:

> "* * * I think everybody concedes [that J] can be asked, you know, did you make these criminal allegations in order to gain some sort of advantage in your dissolution case, you know, that is certainly fair game."

The court instead asked defendant "whether there's an intent to go beyond that."

Later, the trial court again made the same point:

"I'm going to reiterate that I believe it is appropriate in terms of, you know, trying to establish or elicit testimony from [J] about her potential motive or bias or interest against defendant that she made reports to law enforcement or whatever enforcement agency of, you know, perceived or not infractions or offenses of release agreements or [Oregon Liquor Control Commission] licensing agreements or anything along those lines, you know, with the inference being that she has some motive against him.

"I'm not going to permit questioning or argument that suggests that that somehow gives her a tactical advantage in the dissolution."

The court's explanation of its ruling also focused on the actuality of any benefit, rather than whether J might subjectively have believed there to be a benefit. The state had argued that a statutory presumption would lead to marital assets generally being divided equally between the parties, while defendant countered that the trial court retains discretion to make whatever distribution is just and proper under the circumstances. *See* ORS 107.105(1)(f) (how court will determine division of marital property). On these facts, the trial court concluded, J would not gain an objective tactical advantage, and suggesting otherwise would confuse the jury:

"[T]he part about the Court also being able to make a just and proper distribution of property based on all the circumstances. I've been handling divorce cases, probably close to a thousand over the last nine years. I'm not aware of any sort of case law suggesting that criminal conduct[] unrelated to the dissolution action is a circumstance that the Court can consider in making a just and proper distribution of property.

"So, I think it is, in fact, confusing and misleading and prejudicial to suggest that not only did [J's] conduct demonstrate some sort of motive or bias against defendant, * * * but that they also provided her with some sort of advantage in the dissolution.

> "It's that second part that I believe is not consistent with [OEC] 403,[13] because that does mislead the jury into thinking that it would allow her some sort of tactical advantage."

The court then expanded on that idea:

> "So, I don't want this trial, and I don't believe it's appropriate for this trial to go far afield of the criminal matters at issue and to have a side trial about what is happening in their domestic relations case, which would involve testimony that is not otherwise relevant, which would involve witnesses who are not otherwise relevant, and involve a lot of essentially legal judgment in terms of when and why things happened."[14]

We return to defendant's argument on review. In that respect, defendant does not argue that the trial court was legally incorrect as to whether J would *objectively* gain a tactical advantage from false allegations. Defendant also

---

[13] OEC 403 provides: "Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay or needless presentation of cumulative evidence."

[14] The trial court's oral summary of its ruling on the motion *in limine* was well organized and comprehensive. Although it addresses matters not discussed in this opinion, we set it out here:

> "So, motion in limine number one is decided as follows. Defense may question [J] about the reasons for her fleeing or leaving the area and whether or not outstanding payroll taxes that were owed were any factor in that.
>
> "* * * * *
>
> "Defense may question [J] about whether or not she attempted to seek the assistance of the District Attorney's Office or any of their personnel in resisting subpoenas that may have been issued in her domestic relations case.
>
> "Defense may question [J] about whether she made any reports to law enforcement agencies, regulatory agencies, or any other entities to report, you know, potential release agreement violations, law violations, or anything along those lines with the purpose of there being some sort of negative consequence for [defendant].
>
> "Defense may question [J] about the timing of her report to law enforcement about the facts and circumstances that comprise the current indictment. Defense may not ask the [J] or any other witness about the timing of the grand jury presentment.
>
> "Defense may not ask questions or otherwise argue that [J], through some of the actions that I've just discussed that I'm going to allow inquiry into, obtained a tactical advantage in the dissolution case.
>
> "Defense may not question [J] about any *pendente lite* orders that were requested and granted in the parties' domestic relations case."

does not identify any specific evidence that he contends that the trial court had erroneously excluded.[15] Defendant only asserts that the trial court prohibited him from arguing that J *subjectively* believed she would gain a tactical advantage. As we have explained, the trial court did not so rule. Accordingly, we affirm the trial court's ruling.

## V.  CONCLUSION

For the reasons explained above, we agree with defendant that the trial court should have granted the motion for judgment of acquittal as to the second-degree kidnapping count. In our view, the evidence was not sufficient to permit a rational factfinder to find the asportation element of kidnapping. We agree with the state, however, that the trial court correctly denied defendant's motion for motion for judgment of acquittal on menacing. Finally, we reject defendant's argument that the trial court erred in granting the state's motion *in limine*.

The decision of the Court of Appeals is affirmed in part and reversed in part. The judgment of the circuit court is affirmed in part and reversed in part, and the case is remanded to the circuit court for further proceedings.

---

[15] In the Court of Appeals, defendant argued that the trial court had prohibited him from introducing evidence—specifically, from examining J about whether she subjectively believed her allegations would give her a tactical advantage. Defendant also relied heavily on OEC 609-1, which authorizes a party to introduce evidence of bias or interest. Taken together, that may explain why the Court of Appeals rejected his argument based on the failure to make an offer of proof. *See Anderson*, 329 Or App at 772-73 (explaining that OEC 609-1 "applies to *evidence*" (emphasis in original)). Defendant does not renew that argument on review. Regardless, our examination of the transcript shows that the trial court did not limit defendant's questioning in the way he had claimed in the Court of Appeals. Again, the court expressly stated that it was "fair game" for defendant to ask those questions.